Your Honors, if it pleases the Court, my name is Mark Sagis and I represent appellant Mary K. Beckman in this matter. If I may reserve two minutes for rebuttal? Sure. The clock is counting down, so keep an eye on it. The Communications Decency Act was originally created as a shield for Internet service providers and it was designed to allow the Internet to expand. In the past 20 years, it's exploded. And whereas in 1995 it had 3.1 million users, now it has over a billion and a half. They're 37% of the world. It's expanded. What's happening here is that Internet service providers that are matching people with people are utilizing the Communications Decency Act to say we're not responsible for the content of particular postings. We're not trying to hold them responsible for the content of particular postings. But, you know, if you go to the original complaint that was filed and you look at the causes of action that you allege, don't all of them arise or arise from a duty that's related to Match's role as a publisher? Not in the least, Your Honor. And this is a fine-line distinction that I'm asking this Court to recognize. This is not about content. This is not about speech. But the duty — it's their role as a publisher. Well, it's their role as a matchmaking service. So your causes of action — I forget your causes of action, but one was for negligent misrepresentation. Doesn't that come from their duty as a publisher? The negligent misrepresentation is based on the fact that they advertise on TV, radio, and Internet blasts, you know, email blasts, that essentially say this is an entire community of people looking for love, implying that it's safe. That's the misrepresentation, implying that Match.com, if you pay them money, will provide you a dating service that is exceptional, better than going to Craigslist, better than going to free services where — and I agree with the Court — everyone just throws their posting up on the wall. And whatever sticks, sticks. People go there for free and they search. But Match.com goes a step further. They develop the information. They develop the information by taking profiles and matching people. Based on the profile submitted by the criminal here, by Ridley, is that his name? Yes, Wade Ridley. Based on the profile submitted by Ridley, and that alone, do you have a cause of action? I don't understand the question. Well, let me make it clear. Ridley submits a profile. Correct. The profile doesn't say I'm a serial killer or a molester or a bad person. He says, like everybody on Match.com, I'm tall, handsome, and well-educated. Everybody lies on this thing. And so they submit that profile. She says, I'm looking for a guy who's tall, handsome, and well-educated. They say, wow, these match. And they match them. Anybody who thinks the guy on the other side is really that person is an idiot, but that's a separate issue. You're alleging more. You're alleging that they had some duty to investigate this guy, or they should have known about his history. And I'm asking a different question. Based if all that they had, all that they knew or should have known about this guy was his profile, do you have any cause of action? Well, to the extent that you have to couple that question with the fact that I don't have to couple it with another one. So just try that for me. I would say that there is a cause of action, yes, that lies if, in fact, that they allow their advertising to represent that the postings that Wade Ridley will put up there with no other information is safe. And that's not true. Well, but so now you are getting into the Communication Decency Act, because that act seems to say that you don't have liability as somebody who just posts stuff that other people send to you. So that was my question. If they just post the stuff that other people send to them, where is their liability? How can they have liability under the CDA? They would not. And we will – stepping back from their purported representations to the community and their official response to this lawsuit, which said that this lawsuit is absurd and that Wade Ridley is one person and Match is an entire community of people waiting to meet each other. But this is not a jury argument. So work on the law for me. The law states that the content is usually speech. I am arguing and asking this Court to recognize that the content is a human being. The content is not speech. So you are suggesting that they have a duty to investigate that human being? Absolutely. Okay. From whence does that duty arise? The duty arises from a paying subscriber who, in response to the representations that this is a community of safe people who, like you said, are good looking, have wonderful outfits on, are toasting wine in the commercials, 2 and 5 or 3 and 5 or whatever the stat representation is, get married. Everybody has the best of intentions. And I'm going to put my $30 down a month for this service. They have an affirmative obligation to make sure that the people that – Tell me what Nevada case establishes that affirmative obligation. The Nevada case establishes – oh, it's negligence. It's KPMG. If the individual submits themselves to the control of another, their duty arises. And KPMG essentially says that because Match represents that this is a safe community and the people submit themselves by paying – Wow. Wow. Your client was under the control of Match.com? Under the control – But she was required to meet with Mr. Ridley? No. She paid for a service and therefore submitted to Match.com's control in that the images and profiles of people sent to her would, in fact, be what they represented they were. A contractual duty will arise from the payment of a membership fee. In this instance, it does because they met – Not suing for breach of contract. You're suing for tort. Negligence, true. Right. True. I'm just arguing on the duty – You may have a great breach of contract claim, but that's not the one you're asserting. The duty aspect of it arises from a number of different sources. In this particular case, we argue that the duty arises from negligence, that a duty is, in fact, owed because the representations made by Match in their advertising. And again – She doesn't rise from the neck. You have to go deeper. What is the role of Match in this? Match's role is to put human beings together. It's because they're a publisher of third-party information. That's where the duty arises from. And when you pin that duty on its role as a publisher of third-party information, all of these causes of action are grounded on that principle. But let's remember what the Communications Decency Act was designed to protect. Speech. Individuals who removed speech, published speech, editorializing. You know, this is a very troubling case. What happened to your client is terrible, and everybody would acknowledge that. But the communication, the CDA provides a form of immunity, basically. And I'm asking this Court to carve out an exception for dating website services that their goal is to put human beings together because the content is not really content. It's a human. It's a person. Play this out for me, please. But what could Match have warned about other than what Beckman might encounter on its website? They could have warned about his violent propensities. They could have warned about his criminal history. That's the question. Either they had a duty to find out about those or they knew about them. You don't contend they knew. They knew or should have known, correct. No, but you don't contend that they knew, do you? I do believe that we can prove they knew. Not in your complaint. Not in your complaint. Don't allege it in the complaint because the first thing Match did was file a motion to stay discovery. How are we to conduct discovery? A preliminary investigation revealed that other individuals have been attacked, specifically a woman in Texas, after my client was left for dead. A girl in Arizona was murdered. Now, their families don't want to talk to us. They're like, this has been tragic and we want to leave this behind us. But preliminarily, we were able to establish that the woman in Texas met him on Match and Arizona met him on Match, but that the woman in Texas may have commuted that information to Match. Match holds that truth. Whether or not they received e-mail complaints about this individual and did nothing, Match holds it. But we were not allowed to conduct discovery. I interrupted Judge McGeeh's question. Well, I'm just struggling because you didn't allege that in your complaint. And we would have amended the complaint in an abundance of caution. So let's make sure it's a knew or should have known argument. Well, but, see, that's should have known you lose me. Knew you might have me. Should have. Should have known. That's why I'm asking about knew. Knew through conducting background checks or providing the minimum level of protection consistent with their advertising. No, no, no, no. No, no, no. Listen to Judge. You're doing should have known now. Yeah. If you've got evidence that these guys actually knew that this fellow was a killer or a dangerous person and didn't tell and match them, notwithstanding that information, you may have a cause of action in Nevada. I don't know. Nevada still requires a special relationship, but the Court never addressed that issue because you didn't plead it. Right? We didn't. Right, Judge? Stop. Right? That is not totally correct. No. You pled? You pled that they knew? You asked two things. One, we did not plead it. Two, we argued it in front of the district court, and he said even if you pled it, you lose. Okay. So that's why it's a hybrid of both. Okay. You did not plead it. We argued it to the district court, and he denied it and refused to allow us leave to amend to make that a correction on any aspect of the case. Okay. Now, if that's right, don't we have to determine that under Nevada law that would state a cause of action? And tell me what case under Nevada law supports that. Supports the cause of action. I have multiple causes of action. No, no. No, under my view of the world, your only possible cause of action, just accept this for purposes of argument. Is negligent misrepresentation. No, no. No, no. No, no. Stop. Under my view, for purposes of argument, the only way you'd have a cause of action is if these folks knew of Ridley's dangerous propensities and nonetheless went ahead and matched them without warning. Failure to warn. Yeah, that's Sanchez-Walmart. That's a negligence cause of action. That they had a duty. No, it's not. It's not. But. They had a duty to protect. They failed to protect. Wait. We're crossing a point. You have a much broader theory. You may convince the other folks on this theory. You may convince me eventually. But drop it for a second and just concentrate on what I'm saying. Okay. All right. I think you might have a cause of action focused on this one alone. If these folks knew, not should have known. Correct. But knew. Actually knew. Actually knew. Actual knowledge. And nonetheless failed to warn your client when they said we're matching you with Mr. Ridley. And my question is what Nevada case would support that proposition? And I hate to say the same case, but it's Sanchez-Walmart that defines what constitutes duty breach causation. Sanchez-Walmart, however, is a negligent. Negligent. You had the duty to discover and you didn't. I'm asking a different question. And you had cited in the brief the people in the bar. I forget the name of the case. The patrons in the bar in Nevada. Oh, it's Tao versus. Right. But there we have a premises liability sort of relationship. We have a special relationship. So I'm trying to figure out if I run the Nevada Supreme Court, which is what we're supposed to be predicting here, would I find that you stated a cause of action by saying they knew of this but nonetheless did the match. So I'm trying to find your best Nevada case for that proposition. Well, you know, I would argue with that ultimately it defines on ‑‑ it hinges on a duty. And whether or not they had a duty in that case you're talking about, the fight actually occurred in a parking lot. And the question was did this third party have a duty to these two people fighting because it brought one of the persons to the fight. Because he knew something about one of them. Yeah, because they knew that one of them had a violent, you know, was. So do you think, I just want to play this out, do you think that Match here had a duty to monitor their website and their real, the real world activities of their clients and to do background checks? Just to monitor the profiles to be real people as they claim they are or people who are not dangerous. Real people. Yes. Excuse me. Background checks, criminal background checks. You know, for $25 a month you can do unlimited criminal background checks on individuals. And at least if this Court recognizes that and says there are some affirmative obligations that Match has when it puts human beings together, because the profile is not free speech content. It really is a person being put with a person. A little different than free speech or hate speech or whatever the CDA was originally designed to protect, speech. I want to say one final comment. I see that I'm coming. Well, before you say that, let me just ask you this. If you were given leave to amend, what exactly would you allege? I would allege that they knew. That's not in the complaint now. Right. I would allege specifically that they knew or in the alternative right below it, the dangerous. You did allege should have known in the last complaint, didn't you? I did. Okay. So the only thing new is new. Their official response said that this individual had no criminal history. And I submit to the Court, and this is how wrong they are, but it doesn't matter because the CDA protects them, that this individual was arrested in 92 for trying to commit suicide by police officer, 99 for domestic violence, 2001 arrested for battery, 2007 arrested in Scottsdale by police for assault and battery, 2010 attempted suicide, arrested and sent to a psych hospital. Match could have seen that by running a little background check and they don't do it because they don't have to. But you allege that in your previous complaint. Yes. You allege in your previous complaint that they should have known. They should have known. Judge Paz asked you what knew you would allege. I'm asking the Court to carve out an assessment. No, no. I want to answer this question. That they asked you what new fact you would allege. The new facts. What new fact would you allege? You would allege that they actually knew. That they actually knew at the time she posted. That a previous user, because multiple previous users have been victims of this individual, but we have to go a step further and prove that they received an e-mail saying this guy is in fact. What I'm concerned about is what you would allege in the complaint because then that would then require the Court to do an analysis under Nevada law. They alleged, we would allege that in fact that they had prior warning from other users and failed to act. They matched. Why didn't you, why didn't you put that in your report? Because we didn't have that solid yet. And we knew we could amend the complaint as the case evolved. And this is how I do that. I don't want to throw everything to the wall and see what sticks and let it fall off. I can amend the complaint to add causes of action as discovery, which they possess, shows. But you're giving long answers to what I think is a simple question. And this is an important issue for me at least. Are you prepared to amend the complaint to allege that they had actual knowledge. Yes. At the time that they matched your client. Yes. That this guy, let me just finish, that this guy had this dangerous history. Absolutely. Okay. Yes. That's the, that you've answered the question. Okay. Thank you. And on a final note, and it will be the last thing I say, I see I have very little time left. I ultimately, Match.com says that even if they know, and this is in their responsive briefings and pleadings, even if they knew Wade Ridley was a vicious killer, they do not have an affirmative obligation to remove his profile or protect Mary Kay Beckman from him. And if that's the case, this Court should stop that bravado and carve out an exception that says if you knew or should have known, you have to take action to protect other users. Thank you. Thank you, Your Honors. We'll hear from Match. Good morning, Your Honors. Michael Chia for Match.com. May it please the Court. I'm going to start off where the opposing counsel left off on this issue of knew or should have known, and just make a few corrections for the record just for the Court's benefit. Footnote 6 of the opinion, Judge Mahan specifically said that plaintiff has not alleged any facts that match knew or should have known that Ridley was a potential danger to others. That's correct. We read this first amended complaint. That's right. That's correct. So let's assume that he files a new amended complaint and he says you knew. You knew at the time that you matched Beckman with Ridley that Ridley was whatever. Yes. Does that state a cause of action under Nevada law? Well, it doesn't under Rule 8 because he cannot allege. Well, that's a separate issue. The judge might sanction him for alleging it. That's not the question in front of us. The question is if he alleged that, would that state a cause of action under Nevada law? We don't think so, Your Honor. There has to be a special relationship between the parties. Match.com is a site with millions of subscribers. That's what you promised on your website. You promised special relationships. Well, we promised that people have the ability to find relationships with others, but that does not give rise to a special relationship. The district court didn't really explore that issue, though, did it? Well, plaintiff never asked for leave to amend on this point. The only thing plaintiff asked leave to amend on was this negligence per se claim predicated on Section 5 of the FTCA. There was nothing that was provided in the response to the motion to dismiss that says, Judge, we need more time to get discovery. We need to plead facts about knowledge. But is he correct when he said that Judge Walter said even if you allege that you knew, that Match knew, you can't state a cause that your claim for relief would be barred by the CDA? Did Judge Walter say that? I don't think Judge Mahan said that. Oh, Judge Mahan, I'm sorry. But under the Communications Decency Act, that is certainly true. That's the argument you were making. That's correct. You think the CDA, even if they allege that you knew, do you think the CDA protects you? It does, Your Honor. Tell me why. Because knowledge is irrelevant to the application of the Communications Decency Act. Three things have to be true. If you could have known that he was a serial killer and you matched him up, I mean, that you had proof that he was a serial killer and you matched him up and you think the CDA protects you? Yes. I understand that's an uncomfortable conclusion, but that is the logical conclusion. We did have a prior opinion that got withdrawn that disagreed with that. The Internet Brands Act is very different fact circumstance. So you have a very specific allegation of knowledge that's predicated. Well, that's what Judge Morgia just grounded, just made that same point, that you knew that he was a serial killer. Yes. She was a little, well, first of all, we did not. Dramatic there, but. Right. But he's going to allege that. He said absolutely he's going to allege that. You can pursue your rule 8 arguments in the district court. He's going to allege that you knew he was a serial killer. You not only posted his profile, and the CDA may protect you against posting his profile, but you did something more. You then said to Ms. Beckham, here's a guy who matches you, which is, I think, you know, we think he's a good fit. Why is that protected by the CDA? Well, to unpack that question, I think there's two assertions there. One is that we supposedly engage in some kind of active matching, which it's not really clear from the complaint that that happened. Match provides a community of people that one can interact with on the website. But it's not a billboard. You know, you don't just go to it and see, you know, what's available in terms of that's it. You all do take some additional step. There are ways to find people on the site through searching. There are information. Sure, but you do something. Judge McGee asked you. You do something. You say, here's a list of people that we think are better prospects than the world at large. You call it for them. We provide some degree of curation, but all of that falls within our duties as a publisher. The key of the Communications Decency Act. So you're saying you could do that curation with the knowledge that people on the list were serial killers and you wouldn't breach any duty to Ms. Beckham? Perhaps under State law, but under the Communications Decency Act, the key is, did we become an information content provider? In other words, did we become responsible for the creation or development of Ridley's profile and his subsequent communications to plaintiffs? And if the question is, did we know, knowledge is irrelevant. The cases have uniformly rejected notice-based liability for defamation. Those cases, those causes of actions require actual knowledge. And the cases say, no, we're not going to impose knowledge-based liability on service providers. I understand those, and those are helpful to you in the abstract, but you did something extra here. You just didn't publish Ridley's profile. You curated it. In your words. You said to Ms. Beckham, here's a curated list of profiles that we think would be a good match for you, or a curated list of profiles that match your requests. And if you knew that one person in that curated list was a murderer, why does the CDA see your — it's not just — it's the act of curation here that may get you — that I worry about in terms of being covered by the CDA. Well, the act of — I think we have to separate two things, the knowledge and then the act of curation. Sure. The act of curation is an editorial function. It is no different from selecting content to be published on the website. And this Court's decision very — But is it — I mean, selecting things to be on the website, it seems like you're still taking an extra step there beyond that, because you've looked at her, apparently, information, and you've looked at all the other information, and you're making an assessment and then matching them together and saying that they're suitable, you know, for dating. I don't know if it's just, oh, we're not going to publish this one, or we're going to take this out. You're taking — there's another step there that I'm having a little trouble with. But the act of selecting in this hypothetical the two people to be matched with flows from the content that each of them provides. So it's only because they have provided information that, you know, I have a certain demographic and I'm looking for a partner with a certain demographic. That's why people are getting matched. And this Court, in the Carafano decision, Judge Piazza, you were on the panel in that case, said it's okay for a website to classify certain information, to elicit certain information for the purpose of matching its users. That was a matchmaker.com. It was a for-profit, fee-based match service, like Match.com. And so when those two people see each other, and whether it's for — whether it arises from the user finding another person on the site due to searching or due to Match, you know, curating potentially a couple of picks for them, that all flows from the content that was provided to Match.com, the users. And Match is not changing — Match is not becoming the information content provider with respect to that content. It's not transforming it in any way that contributes to the illegality of these cases. If Doe were to remain — the panel reissues the opinion that it remains exactly the way it were before. Do you agree that as to this knowledge-based account, it would survive the CDA at least? I don't, Your Honor. And the reason is that the Doe case doesn't actually turn on the knowledge. It turns on the knowledge as to whether or not there's a state law claim. But as to the CDA, the panel there is not saying that Internet brands became the information content provider with respect to any profiles. It's actually looking at the third prong of the CDA, which is, does the plaintiff's claims treat the service provider as the publisher or speaker of the information content? And there the problem was that the complaint actually said nothing about how the bad guys in that case found, lured Jane Doe to her harm. And so the court — Well, they found her through the Internet. I mean, they found her through the site. That's according to the facts in the opinion. No. Your Honor, I respectfully disagree. The panel — They found her. She posted her information on the site. They found it — they found her information on the site, and then they contacted her apart from the site. Correct. Correct. That's the implication from the — Right. That's the way I understood the opinion. They then contacted her outside of the website. Right. And what the court said was the trouble we're having is that it's not a case where the bad guys published a profile on ModelMayhem.com and then contacted the plaintiff through that. So what are we — what are we being — where is the website being treated as the publisher? Whereas in this case — Well, they published her information. Well, I think that's — And they argued — they argued strenuously that they were protected by the CDA. And the panel said no because they knew. And there was a real knowledge in that one. And they had sued the — the fellow whom they bought the site from. Correct. Because he knew. Correct. He knew everything about the two guys that were into this criminal activity. That's correct, Your Honor. Very specific knowledge allegations, unlike the case here. Right. But the knowledge issue doesn't impact the CDA analysis. It — what the court said is we're not willing to find that merely by publishing the plaintiff's profile. There's nothing wrong with the plaintiff's profile, but by merely being a host for that service, we're unwilling to find that that alone is treating the website as a publisher. We disagree, but — So they knew — they knew before they actually published. And that's where they seem to have grounded the claim. I'm not sure it's clear, Your Honor, when the knowledge — The CDA doesn't provide immunity for that. Again, Your Honor, I'm not — I'm not sure the opinion says at what point they had the — they had the knowledge. No, we don't know. We don't know. It's of no precedential value, and we have to wait to see what they say in their forthcoming — And one of the issues I'm interested in, at least, is whether we should wait for it and see what the new opinion says. Yes. And that's — that's why I asked you the question. But let me — let me ask you a different one. I want to understand the nature — how this business works. I understand generally people send in their profiles. And then when you communicate the curated list, that's not posted on the Internet generally, is it? It's a communication to Ms. Beckham. Would be published to the individual user, correct. Right. Is that covered by the CDA? Yes. Anything that flows through the Internet, through a connected network environment, is going to be covered by — Well, but when you do that, you're making a representation to her, are you not? That — that we've — we — it may not be — it may be a different representation that he thinks you're making, but it may — it's some sort of representation that we've — we've — we've looked at the profiles, and we think this is one that might be of interest to you. Is that a — is that a fair — We don't think it's any different from the case where someone is just searching and then finding profiles on the site that match what — what they're looking for. Yeah, well, why isn't it different? Why — why aren't you saying for your $30 a month or $25 or whatever they pay you, we do something extra. We just don't post all this stuff on the site and make you sort through it. We apply our expert algorithms or something to — to the profiles, and we find people who — who's — who match you in some way. It's the name of your service. Why isn't — why isn't that a representation made wholly apart from your publication? Well, Your Honor, we're not actually saying anything at the time. We're publishing those profiles in that way to people. It's simply based on the characteristics and our editorial judgment. And if — Well, you're implicitly saying something. Well, but in fact — Surely you're implicitly saying, we've done something. I have no idea what you do. You don't randomly — And this is — and this is a smaller group than the list of the world at large that we think you would be interested in. It's not a random. You don't just pick every fourth person that, you know, who's on your list. I mean, you do something. You look at it, right? There is some degree of randomness. And then you give it to that person for what purpose? The purpose is to help people who might not be actively using the site to search, to say, hey, look, there are people out there that match your characteristics. So you — how do you know they match their characteristics? It would be based on what they are looking for in — So you — you exercise some judgment, whether it's editorial or otherwise. I mean, so that's what you're charged for. And you say, hey, you've told us what you're looking for, the characteristics. Somebody else has told us characteristics. We've done something. We've run it through our computer. Or there are 4,000 paid interns sitting in a room with pieces of paper, and they've done something and come up with this shorter list. Isn't that a representation of some kind that we've gone through this list and we think these people are at least not inappropriate for you to contact? It is not a representation beyond the fact that these people match the characteristics that you as the user submitted. And if it were a case where every time a publisher website became liable for an implicit representation, then you would gut the CDA, because then every claim is going to be, well, it's not the fact that, you know, the content itself harmed me. It's your implicit representation every time, you know, I get a Facebook friend request or I get a LinkedIn request. Is there an implicit representation on the part of the service provider that these are good people that aren't going to harm me? And we respectfully submit that the answer has to be no. He's not asserting a false advertising claim against you, I take it. I mean, at least in a complaint. Plaintiff? No. We don't understand why. She, I'm sorry. No. Because it sounds to me like based on your argument today, they might have a good one. But that's a separate issue. Well, we respectfully disagree, Your Honor. I notice my time is up. I would just want to reiterate that we, there are two grounds for dismissing, for affirming here. One is the CDA and one is the State law claims. We respectfully refer the panel to our briefing on the State law issues. Thank you, counsel. Thank you. You have one minute. We do have a false advertising claim. Right. But this is the FCC. We'd have to conclude contrary to the district court. We'd have to conclude that this was meant to provide a cause of action. A negligence per se, cause of action under State law. Yes. That was one of the issues on appeal. And just to further elaborate on what Your Honor was just previously referencing, Match.com unequivocally develops the information. They take the information provided by individuals. They match these individuals with other paying users. And then in your inbox, you double-click, it's an email from Match.com that says, essentially, we have a match. And it tells you to send them a wink, say hello to them, start your life, you know, your future awaits you. That development of that information, it comes with implicit representations based on their advertising and their statements that, in fact, this individual has some, has not just thrown up on the wall, random person. This is a Match.com individual, and we put him with you. Wink to him. Contact him. And that development is an additional step that we think makes them not protected by the CDA. Thank you. Thank you. The matter is submitted.
judges: Paez, Murguia, Hurwitz